## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL SCHWARTZ, Individually and on Behalf of All Others Similarly Situated, )
)
)
Plaintiff, )
)
v. )
)
NORTHSTAR REALTY EUROPE CORP., RICHARD BRETT SALTZMAN, JUDITH A. HANNAWAY, MAHBOD NIA, THOMAS J. BARRACK, JR., WESLEY D. MINAMI, OSCAR J. JUNQUERA, DIANNE HURLEY, and MARIO CHISHOLM, )
)
)
)
)
)
)
)
)
Defendants. )
)
)
)

Case No. 1:19-cv-7915

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Michael Schwartz ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of NorthStar Realty Europe Corp. ("NRE" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with NRE, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between NRE and AXA Investment Managers – Real Assets ("AXA").

2.      On July 3, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $17.03 in cash for each share of NRE stock they own (the "Merger Consideration").

3.      On August 1, 2019, in order to convince NRE shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act. On August 14, 2019, the Company filed a Form DEFM14A Definitive Proxy Statement (the "Proxy") that did not correct the materially incomplete and misleading nature of the preliminary proxy. The Board has scheduled a special meeting of the Company's shareholders on September 25, 2019 to vote on the Proposed Transaction.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that NRE shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by NRE's financial

advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to NRE shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because NRE maintains its principal executive offices in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of NRE common stock.

12.    Defendant NRE is incorporated in Maryland and maintains its principal executive offices at 590 Madison Avenue, 34th Floor, New York, NY 10022. The Company's common stock trades on the NYSE under the ticker symbol "NRE."

13.    Individual Defendant Richard Brett Saltzman is NRE's Chairman and has been a director of NRE at all relevant times.

14.    Individual Defendant Judith A. Hannaway is NRE's Lead Director and has been a director of NRE at all relevant times.

15.    Individual Defendant Mahbod Nia is NRE's President and Chief Executive Officer and has been a director of NRE at all relevant times.

16.    Individual Defendant Thomas J. Barrack, Jr. has been a director of NRE at all relevant times.

17.    Individual Defendant Wesley D. Minami has been a director of NRE at all relevant times.

18.    Individual Defendant Oscar J. Junquera has been a director of NRE at all relevant times.

19.    Individual Defendant Dianne Hurley has been a director of NRE at all relevant times.

20.     Individual Defendant Mario Chisholm has been a director of NRE at all relevant times.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of NRE (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of August 12, 2019, there were approximately 50,000,000 shares of NRE common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of NRE will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

      ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

      iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.    **The Proposed Transaction**

24.    NRE is a publicly traded real estate investment trust focused on European commercial real estate. The Company maintains prime office properties in key cities within Germany, the United Kingdom and France.

25.    On July 3, 2019, NRE and AXA issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> NEW YORK--(BUSINESS WIRE)--NorthStar Realty Europe Corp. (NYSE: NRE) (the "Company" or "NRE") today announced that following a comprehensive strategic review it has entered into a definitive merger agreement with AXA Investment Managers - Real Assets ("AXA IM - Real Assets"), a global leader in real asset investments, acting on behalf of a client, for the acquisition of all of the outstanding shares of common stock of the Company. The estimated per share merger consideration of US$17.03 is based on the three-month forward foreign exchange rates and represents a 16.4% premium to the Company's unaffected closing stock price of US$14.63 on November 6, 2018, the last reporting day before NRE announced its strategic review process. Since NorthStar Realty Europe completed its spin-off on November 2, 2015, stockholders will realize an approximate 16% IRR on their investment assuming the estimated per share merger consideration of US$17.03.

> The estimated merger consideration reflects a gross asset value for the Company's assets in line with the Company's most recently reported independent portfolio valuation[ii] by Cushman & Wakefield LLP, which was reflected in the March 31, 2019 EPRA[iii] Net Asset Value ("EPRA NAV") per share of NRE. The Company's March 31, 2019 EPRA NAV per share of US$20.48 per share is reduced to reflect (i) approximately $1.54 per share related to the remaining portion of the termination payment to our external manager and transaction related costs, (ii) approximately $0.21 per share related to the issuance of annual compensation and retention shares subsequent to March 31, 2019, (iii) approximately $0.57 per share related to the accelerated vesting of performance shares in connection with the Merger, (iv) approximately $0.13 per share related to currency changes since March 31, 2019, (v) approximately $0.23 per share due to dividends net of projected cash flows, and (vi) approximately $0.58 per share related to local jurisdiction latent capital gains taxes and net working capital adjustments. Pro forma for these adjustments and assuming a transaction close at September 30, 2019, the Company's Adjusted EPRA NAV per share is approximately US$17.22. For more information and a reconciliation of the Company's March 31, 2019 EPRA NAV, please refer to the tables on the following pages.

Under the terms of the merger agreement, NRE stockholders will receive in cash at closing, for each share of common stock, US$1.68 plus the U.S. Dollar equivalent of €9.26 and £3.82, representing an estimated per share merger consideration of US$17.03 based on three month forward foreign exchange rates.[iv] This reflects the geographic location of assets across the U.K., France and Germany. Based on spot foreign exchange rates of 1.1290 EUR/USD and 1.2595 GBP/USD as of July 2, 2019, per Bloomberg, the estimated per share merger consideration is US$16.95 per share, implying a 15.8% premium to the Company's unaffected closing stock price.

In connection with the transaction, NRE has entered into six-month forward contracts for the purchase of U.S. Dollars for €482 million and £199 million, the approximate aggregate amount of the merger consideration denominated in Euros and Pound Sterling. In connection with the closing of the merger, these forward contracts will be settled and the portion of the merger consideration denominated in Euro and Pound Sterling will be paid to NRE stockholders in U.S. Dollars reflecting the final exchange rate received in settlement of the forward contracts (which may be at rates greater or less than the currently estimated exchange rates, depending on the closing date). Assuming an early fourth quarter 2019 closing, stockholders are expected to receive the equivalent of the three month forward foreign exchange rate consideration of US$17.03 with an additional nominal adjustment to proceeds to account for the interest rate differential from the period of original settlement date to the closing date.

The announcement follows a comprehensive review of strategic alternatives by the Strategic Review Committee (the "SRC") of the Company's Board of Directors (the "NRE Board"). **The SRC, comprised solely of independent directors, has unanimously recommended the transaction to the Board of Directors, which has unanimously approved the transaction.**

Mahbod Nia, Chief Executive Officer and President of the Company, stated, "The SRC ran a comprehensive strategic review process, considering all options and engaging with a wide group of potential buyers. We are pleased that the process has culminated in a transaction that unlocks the significant value we have created for NRE stockholders since inception, realizing an approximate 16% IRR assuming the estimated per share merger consideration of $17.03."

John O'Driscoll, European Head of Transactions at AXA IM – Real Assets, stated, "The acquisition of NRE through this public to private transaction is a rare opportunity to secure a significant portfolio of prime modern offices located in the major cities of Europe's largest economies of France, the U.K. and Germany, in a single transaction. The properties have high occupancy and produce strong levels of income that are ideally suited to our clients and we look forward to utilizing our extensive European network of expert real estate managers to create further value from the portfolio in the future."

The Client of AXA IM -- Real Assets will finance the transaction through the arrangement of equity financing and the Company's available cash at closing. The transaction is not subject to any financing condition.

Pursuant to the merger agreement executed by the parties, the closing of the transaction is subject to customary closing conditions, including approval by a majority of the Company's stockholders. The closing is expected to occur in the fourth quarter of 2019, subject to satisfaction of all closing conditions. Prior to closing, NRE expects to pay its final quarterly dividend of $0.15 per share in August 2019.

**Process Background:**

- On March 23, 2017, the Board of Directors established the SRC, consisting solely of independent directors of NRE to negotiate on behalf of NRE amendments to the Company's management agreement with its external manager, an affiliate of Colony Capital, Inc. (NYSE:CLNY) (the "Asset Manager" or "CLNY"). The management agreement then provided for a 20 year term from October 31, 2015 with automatic renewals for additional 20 year terms and no right on the part of the Company to terminate other than for "cause."

- On November 9, 2017, NRE and CLNY entered into an amended management agreement allowing NRE to terminate the agreement on December 31, 2022. This amended agreement provided for a minimum term of 5 years. It also provided for payment of a termination fee of three times (3x) the base management fee plus potential incentive fees in connection with a change of control transaction, which could only occur after the minimum term.

- On November 7, 2018, NRE and CLNY entered into a further amendment to the management agreement allowing NRE to terminate the management agreement upon a sale of the Company (or in connection with the internalization of the management of NRE) in exchange for a payment to CLNY of $70 million, minus the amount of any incentive fee previously paid to CLNY. In connection with this amendment, NRE announced that the SRC was conducting a process to review strategic alternatives in an effort to maximize stockholder value.

- As part of the strategic review process, NRE and its advisors conducted detailed discussions with a broad group of potential counterparties starting in December 2018 to ascertain their interest in a potential transaction. In addition to a sale of the Company as a whole, the SRC explored in detail, with the assistance of its advisors, the feasibility of selling the Company's different asset portfolios in separate transactions (followed by a wind-down of the Company), as well the internalization of the management of NRE. Based on its extensive analysis, the SRC concluded that the proposed sale of NRE would deliver superior

stockholder value compared to the other alternatives potentially available to the Company.

**Advisors**

The Strategic Review Committee is being advised by Goldman Sachs & Co. LLC and is receiving legal counsel from Fried, Frank, Harris, Shriver & Jacobson LLP. The Company is receiving legal counsel from Sullivan & Cromwell LLP, Clifford Chance LLP and Venable LLP, compensation and benefits counsel from Goodwin Procter LLP and tax counsel from Vinson & Elkins LLP.

AXA IM -- Real Assets is being advised by Deutsche Bank Securities Inc. and is receiving legal counsel from DLA Piper LLP. In addition, KPMG provided accounting, financial, and tax due diligence advisory services and CBRE provided real estate advisory services.

**About NorthStar Realty Europe**

NorthStar Realty Europe Corp. (NYSE: NRE) is a European-focused commercial real estate company with predominantly high quality office properties in Germany, the United Kingdom and France, organized as a REIT and managed by an affiliate of Colony Capital, Inc. (NYSE:CLNY), a leading global real estate and investment management firm. For more information about NorthStar Realty Europe Corp., please visit www.nrecorp.com.

26.      NRE is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

27.      If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading Proxy

28.    On August 1, 2019, Defendants caused the preliminary proxy to be filed with the SEC in connection with the Proposed Transaction. The preliminary proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the preliminary proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act. On August 14, 2019, Defendants caused the Proxy to be filed. The Proxy did not correct the materially incomplete and misleading nature of the preliminary proxy and thus continues to violate Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

29.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that "in connection with the evaluation of a possible transaction involving NRE, NRE provided to the [strategic review committee]'s financial advisor, Goldman Sachs, certain non-public unaudited financial forecasts covering multiple years that were prepared by the management of NRE and not for public disclosure." Proxy 62.

30.    The Proxy further discloses that the assumptions used in the financial projections were "reasonable as of the respective dates when such projections were finalized." *Id.* at 62-63.

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers

and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*
>
> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.    Here, NRE shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts in forming the belief that "the merger agreement and all related agreements and documents [are] advisable and in the best interest of NRE . . . ." Proxy 51.

35.    As discussed further below, the non-GAAP financial projections here do not provide NRE shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

36.    The Proxy discloses that, "in connection with the evaluation of a possible transaction involving NRE, NRE provided to the [strategic review committee]'s financial advisor, Goldman Sachs, certain non-public unaudited financial forecasts covering multiple years that were prepared by the management of NRE and not for public disclosure." *Id.* at 62.

37.    The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 for: (1) Property Net Operating Income; (2) EBITDA; (3) Funds From Operations; (4) Adjusted Funds From Operations; (5) Cash Available for Distribution; and (6) Levered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 64.

38.    The Proxy defines Property Net Operating Income ("Property NOI"), "a non-GAAP measure . . . as the total cash net operating income for NRE's current operating portfolio, plus the total net operating income for NRE's incremental direct equity investments." *Id.* at 64

n.1. Nevertheless, the Proxy fails to disclose the line items used to calculate Property NOI, rendering the Proxy materially false and/or misleading. *Id.*

39.     The Proxy defines EBITDA, "a non-GAAP measure, as Property NOI, adjusted to include interest income from preferred equity investments, straight line rental income, NRE's share of income from joint venture investments, plus various fees from joint venture partners on an amortized basis, less corporate general and administrative expenses and other expenses." *Id.* at 64 n.2. Nevertheless, the Proxy fails to disclose the line items used to calculate EBITDA, rendering the Proxy materially false and/or misleading. *Id.*

40.     The Proxy defines Funds From Operations ("FFO"), "a non-GAAP measure . . . as EBITDA adjusted to include interest expense and current tax expense." *Id.* at 64 n.3. Nevertheless, the Proxy fails to disclose the line items used to calculate FFO, rendering the Proxy materially false and/or misleading. *Id.*

41.     The Proxy defines Adjusted Funds From Operations ("AFFO"), "a non-GAAP measure . . . as FFO, adjusted to exclude straight line rental income, recurring maintenance capital expenditures and adjusted to actual cash received during the period related to various fees from joint venture partners." *Id.* at 64 n.4. Nevertheless, the Proxy fails to disclose the line items used to calculate AFFO, rendering the Proxy materially false and/or misleading. *Id.*

42.     The Proxy defines Cash Available for Distribution ("CAD"), "a non-GAAP measure . . . as FFO adjusting to include gains or losses on settlement of foreign currency derivatives and to exclude stock based compensation expense." *Id.* at 64 n.5. Nevertheless, the Proxy fails to disclose the line items used to calculate CAD, rendering the Proxy materially false and/or misleading. *Id.*

43.    The Proxy defines Levered Free Cash Flow ("LFCF") "as EBITDA less interest expense, less current tax expense, less straight line rental income, less recurring maintenance capital expenditures and adjusted to actual cash received during the period related to various fees from joint venture partners, less new investments net of debt financing and less other cash flow items." *Id.* at 64 n.6. Nevertheless, the Proxy fails to disclose the line items used to calculate LFCF, rendering the Proxy materially false and/or misleading.  *Id.*

44.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

45.    The financial projections disclosed on page 64 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

46.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisor.

### *The Financial Projections Violate Regulation G*

47.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

48.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

49.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]    Former SEC Chairwoman Mary Jo White has stated that the

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]    SEC, *Final Rule.*

[5]    *See, e.g*., Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as NRE included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

50. The SEC has required compliance with Regulation G, including reconciliation requirements, in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

of actual and projected EBIT to GAAP net income . . . .").[9]

51.      Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

52.      In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

53.      Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above. Indeed, Defendants acknowledge that

---

[9]      *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/ filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.      The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

"[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for financial information presented in compliance with GAAP, and non-GAAP financial measures as presented in this proxy statement may not be comparable to similarly titled amounts used by NRE or other companies."  Proxy 62.

54.    Moreover, the disclosed EBITDA and CAD were calculated using a different methodology than traditionally utilized by NRE. *Id.* at 64 nn.2 & 5.

55.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

56.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 64, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### The Materially Misleading Financial Analyses

57.    The summary of the valuation methodologies utilized by Goldman Sachs, including the utilization of certain of the non-GAAP financial projections described above by Goldman Sachs in connection with its valuation analyses, (*id.* at 55) is misleading and in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

58.    With respect to Goldman Sachs's compensation, the Proxy fails to disclose how much is contingent on the consummation of the merger. *Id.* at 61.

59.    With respect to Goldman Sachs's *Illustrative Present Value of Future Share Price Analysis*, the Proxy states that Goldman Sachs calculated the theoretical present value of NRE's

stock price based on a premium or discount to the Company's projected net asset value ("NAV"). *Id.* at 57. Goldman Sachs estimated the Company's NAV as of December 31, 2019, 2020, 2021 and 2022, and then applied a discount rate ranging from 10% to 30%. *Id.* Goldman Sachs then discounted those values using a discount rate of 6.1%, reflecting the cost of equity as derived by the capital asset pricing model. *Id.* at 58.

60.     Goldman Sachs also performed an analysis on the implied present value of a future value per share of NRE common stock based on the next 12 months FFO multiples. *Id.* Goldman Sachs calculated the range of theoretical future values per share as of December 31, 2019, 2020, 2021 and 2022 by multiplying the next twelve months FFO multiples ranging from 14.0x to 18.0x by the estimates of NRE's FFO for each period. *Id.* Goldman Sachs then discounted those values using a discount rate of 6.1%, reflecting the cost of equity as derived by the capital asset pricing model. *Id.*

61.     The Proxy fails to disclose the projected NAVs and the inputs that went into the cost of equity, including the company-specific beta.

62.     With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis*, the Proxy states that Goldman Sachs calculated the estimated levered free cash flows that NRE was forecasted to generate for the years 2019 through 2023 and a range of terminal values calculated by applying a perpetuity growth rate ranging from 1.0% to 2.0% to a terminal year estimate of the levered free cash flow.  *Id.* Goldman Sachs used a 6.0% to 7.0% discount rate, which reflected NRE's cost of equity using the capital asset pricing model. *Id.* Goldman Sachs then divided by the number of fully diluted shares outstanding as of June 26, 2019 to get the implied per share equity value. *Id.*

63.     The Proxy does not disclose the line items used to calculate the Company's levered free cash flows, the range of terminal values, any of the inputs that went into calculating the Company's cost of equity, how stock-based compensation was treated, what, if any, enterprise adjustments were made nor the number of fully diluted shares of NRE outstanding.

64.     Since information was omitted, shareholders are unable to discern the veracity of Goldman Sachs's *Illustrative Discounted Cash Flow Analysis*.   Without further disclosure, shareholders are unable to compare Goldman Sachs's calculations with the Company's financial projections.   The absence of any single piece of the above information renders Goldman Sachs's *Illustrative Discounted Cash Flow Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

65.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id.* (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .   The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

66.     Thus, in order for NRE shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

67.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from NRE shareholders.

68.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

69.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

72.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

73.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

74.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

76.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

77.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

78.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

79.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

80.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

81.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

82.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

83.    NRE is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

84.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

85.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction,

Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

86.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

87.    The Individual Defendants acted as controlling persons of NRE within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of NRE, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

88.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

90.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

91.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

92.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

       D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

       E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 23, 2019

                          Respectfully submitted,

                          **FARUQI & FARUQI, LLP**

                          By: _/s/ James M. Wilson, Jr._

                          Nadeem Faruqi
                          James M. Wilson, Jr.
                          685 Third Avenue, 26th Floor
                          New York, NY 10017
                          Tel.: (212) 983-9330
                          Fax: (212) 983-9331
                          Email: nfaruqi@faruqilaw.com
                                      jwilson@faruqilaw.com

                          *Counsel for Plaintiff*